# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ST. AUGUSTINE SCHOOL, et al.,
        **Plaintiffs,**

        **v.**                                **Case No. 16-C-0575**

JILL UNDERLY, in her official capacity
as Superintendent of Public Instruction,
et al.,
        **Defendants.**

## DECISION AND ORDER

This case, which has a long procedural history, involves a Wisconsin law that requires local school districts to provide transportation benefits to private schools. *See* Wis. Stat. §§ 121.51, 121.54. Under the law, as interpreted by the Wisconsin Supreme Court, only one school affiliated with or operated by a single "sponsoring group" may receive benefits within a single attendance area. The law allows religious schools to receive benefits. However, a religious denomination is considered a "sponsoring group" for purposes of the rule limiting benefits to one school per sponsoring group per attendance area.

In 2015, St. Augustine School applied for transportation benefits for three of its students. St. Augustine is a Roman Catholic school, and at the time it applied for benefits, a different Roman Catholic school, St. Gabriel, was already receiving transportation benefits for an attendance area that overlapped with St. Augustine's. For this reason, the local school district denied St. Augustine's benefits claim. St. Augustine then appealed to the state superintendent of public instruction, claiming that St. Augustine, unlike St. Gabriel, was not affiliated with the Archdiocese of Milwaukee and therefore was not

affiliated with or operated by the same sponsoring group as St. Gabriel. The state superintendent denied St. Augustine's appeal.

Following the denial, St. Augustine and parents of some of its students filed the present action in Wisconsin state court against the school district and the superintendent. They alleged, among other things, that the denial of benefits violated their rights under state law and the Free Exercise and Establishment Clauses of the First Amendment. The defendants removed the case to this court. In June 2017, I issued an order denying relief on the plaintiffs' federal claims and relinquishing supplemental jurisdiction over the state claims. *St. Augustine Sch. v. Evers*, 276 F. Supp. 3d 890 (E.D. Wis. 2017). The plaintiffs appealed, and the Seventh Circuit initially affirmed. *St. Augustine Sch. v. Evers*, 906 F.3d 591 (7th Cir. 2018). The plaintiffs then filed a petition for certiorari with the Supreme Court of the United States. The Supreme Court granted the petition, vacated the Seventh Circuit's order, and remanded the case to the Seventh Circuit for reconsideration in light of *Espinoza v. Montana Department of Revenue*, 591 U.S. __, 140 S. Ct. 2246 (2020).

On remand, the Seventh Circuit certified a question of state law to the Wisconsin Supreme Court. After the state supreme court answered the question, *see St. Augustine Sch. v. Taylor*, 398 Wis. 2d 92 (2021), the Seventh Circuit reconsidered the case and decided that, as a matter of state law, the plaintiffs were entitled to transportation benefits. *St. Augustine Sch. v. Underly*, 21 F.4th 446 (7th Cir. 2021). The court also concluded that, because the plaintiffs were entitled to benefits under state law, the court did not need "to reach any constitutional issues in this case." *Id.* at 451. The Seventh Circuit remanded the case to me to determine whether any plaintiff was entitled to monetary damages or injunctive relief.

2

As discussed in more detail below, the Seventh Circuit's latest opinion creates a bit of a mystery. The court said that it was deciding the case under state law, but by that point in the case the plaintiffs had abandoned their state-law claims. Moreover, the court determined that a decision on federal constitutional issues was unnecessary, even though those issues were the only ones remaining in the case and formed the basis for the plaintiffs' claims for damages. These aspects of the court's opinion have led to a dispute among the parties over what I am to decide on remand. The plaintiffs contend that I must decide the merits of their federal claims, while the defendants contend that I am limited to determining whether the plaintiffs are entitled to damages or injunctive relief under state law.

In this opinion, I attempt to carry out the Seventh Circuit's instructions.

## I. BACKGROUND

### A. Wisconsin's System for Providing Transportation Benefits to Private Schools

Wisconsin law requires the school board of a school district to provide each student residing in the district with transportation to and from his or her school if the student resides two miles or more from the school. Wis. Stat. § 121.54(2). The school board must provide transportation even to students who attend a private school—even a religious private school—but only "if such private school is a school within whose attendance area the pupil resides" and the school is located either within the school district or within five miles of the district's boundaries. *Id.* § 121.54(2)(b)1. The "attendance area" is the geographic area designated by the private school as the area from which it draws its students, but the school board of the district must also approve the attendance area. *Id.* § 121.51(1). If the private school and the school board cannot agree on the attendance

3

area, the state superintendent of public instruction must, upon the request of the private school and the school board, make a final determination of the attendance area. *Id.* As is relevant to this case, the law provides that "[t]he attendance areas of private schools affiliated with the same religious denomination shall not overlap." *Id.*

To avoid a constitutional problem, the Wisconsin Supreme Court long ago determined that the prohibition on overlapping attendance areas must apply to all private schools, not just to religious private schools. *State ex real. Vanko v. Kahl*, 52 Wis. 2d 206, 215 (1971). The court understood the statute to prohibit "overlapping in attendance area boundary lines as to *all* private schools affiliated or operated by a single sponsoring group, whether such school operating agency or corporation is secular or religious." *Id.* The *Vanko* court recognized that this interpretation of the statute seemed to reduce the "same religious denomination" sentence in § 121.51 to "mere surplusage." *Id.* However, the court determined that this sentence still added something to the statute, which was "to make 'affiliated with the same religious denomination' the test of affiliation in a single school system rather than operation by a single agency or set of trustees or religious order within a particular religious denomination." *Id.* The court gave the following example:

> [The sentence] means that, if the Franciscan Order of the Roman Catholic church operates a school in the northern part of the Racine district, and the Jesuit Order operates a school in the southern part of the district, they are to be considered, along with diocesan schools, as part of the Catholic school system of Racine because all are "affiliated with the same religious denomination."

*Id.* at 215–16.

In a subsequent case, *Holy Trinity Community School, Inc. v. Kahl*, 82 Wis. 2d 139 (1978), the court considered the question of how state officials were to determine whether a private school is affiliated with a particular religious denomination. The court concluded

4

that, to avoid "excessive entanglement of state authority in religious affairs," *id.* at 150, state officials could not determine the affiliation of a religious school by monitoring and evaluating its practices or personnel, *id.* at 150–53. Instead, officials were to "accept the *professions* of the school and to accord them validity without further inquiry." *Id.* at 155 (emphasis added).

**B.    The Plaintiffs' Requests for Transportation Aid**

St. Augustine is a private elementary and high school that, at the time when this action was filed, was located in Hartford, Wisconsin. It has since relocated by a few miles to Colgate, Wisconsin, but this move did not affect its attendance area. The school has described itself to this court as "an independent religious school that teaches and operates in a manner that its Board of Directors believes is consistent with the long-standing traditions of the Catholic faith." (Decl. of Tim Zignego ¶ 3, ECF No. 26.) The school is controlled by its own board of directors and is not affiliated with the Archdiocese of Milwaukee or any religious order of the Catholic church.

From 2015 to 2021, plaintiffs Joseph and Amy Forro sent their three children to St. Augustine.[1] During those years, the Forros lived within the Friess Lake School District, which, in 2018, merged with another school district to become the Holy Hill Area School District. On April 27, 2015, St. Augustine sent a letter to the school district requesting transportation benefits for the Forro children pursuant to Wis. Stat. § 121.54. In the letter,

---

[1] Because the Forros no longer send their children to St. Augustine, their claim for injunctive relief is moot. However, they are still proper parties because they seek damages for the denial of transportation aid for the years in which they sent their children to St. Augustine.

5

St. Augustine described itself as "an independent, private Catholic school." (Zignego Decl., Ex. D at 1, ECF No. 26-4.) St. Augustine also stated that it was not affiliated with the Archdiocese of Milwaukee. (*Id.*)

In responding to St. Augustine's request for benefits, the school district noted that it already provided transportation benefits to St. Gabriel, a Roman Catholic school that had the same attendance area as St. Augustine. (Zignego Decl., Ex. G, at 1, ECF No. 26-7.) The school district acknowledged that St. Augustine was "incorporated under a different charter" than St. Gabriel, but it concluded that because both schools claimed affiliation with the religious denomination known as Roman Catholicism, the school district could not provide the Forro children with transportation to and from St. Augustine. (*Id.*)

After St. Augustine and the school district failed to agree on an attendance area, they submitted their dispute to the state superintendent of public instruction for a final determination under Wis. Stat. § 121.51(1). In its letter to the superintendent, St. Augustine argued, as it did to the school district, that its attendance area could overlap with St. Gabriel's because St. Gabriel was a Roman Catholic school affiliated with the Archdiocese of Milwaukee, while St. Augustine was independent of the Archdiocese. (Zignego Decl., Ex. I, at 1–2, ECF No. 26-9.) The school district argued that St. Augustine and St. Gabriel could not have overlapping attendance areas because they both described themselves as Catholic schools and therefore were, for purposes of § 121.51(1), affiliated with the same religious denomination, even if they were each incorporated under a different charter.  (Aff. of Laura Varriale, Ex. F, ECF No. 33-6.) The school district provided the superintendent with print-outs from St. Augustine's website,

6

which described the school as "an independent and private traditional Roman Catholic School." (*Id.* at ECF p. 5 of 10.)

On March 10, 2016, the superintendent, through his designee, issued a written decision. (Zignego Decl., Ex. J, ECF No. 26-10.) After stating the parties' positions and discussing the relevant legal authority, the superintendent noted that St. Augustine had not submitted any governing documents, such as articles of incorporation, that identified its religious affiliation. The superintendent determined that, in the absence of a statement of religious affiliation in St. Augustine's governing documents, the school district was allowed to use the statement of religious affiliation on St. Augustine's public website to determine whether it was affiliated with the same religious denomination as St. Gabriel. The superintendent also determined that the website showed that St. Augustine was "a religious school affiliated with the Roman Catholic denomination." (*Id.* at 7.) Because St. Gabriel was also affiliated with that denomination and was already receiving state aid to transport students within St. Augustine's attendance area, the superintendent upheld the school district's determination that St. Augustine was not entitled to transportation aid.

C.     **The Present Lawsuit and First Appellate Decision**

After the superintendent affirmed the school district's decision to deny transportation aid to St. Augustine students, the plaintiffs filed this lawsuit in state court. The defendants were the state superintendent (then Tony Evers) in his official capacity and the Friess Lake School District. The plaintiffs alleged claims under state and federal law. Their state-law claim sought either an order declaring that the decision by the school district and the superintendent violated Wis. Stat. §§ 121.51–121.55, or certiorari review of the superintendent's administrative decision. (Compl. ¶¶ 71–73.) The plaintiffs' federal

7

claims alleged violations of the Free Exercise and Establishment Clauses and sought relief under 42 U.S.C. § 1983.[2] (Compl. ¶¶ 59–69.) The plaintiffs sought injunctive relief against the superintendent in his official capacity and damages against the school district.

After the parties filed cross-motions for summary judgment, I determined that the plaintiffs' state-law claim presented a novel question of state law and relinquished supplemental jurisdiction over it pursuant to 28 U.S.C. § 1367(c)(1). *St. Augustine*, 276 F.Supp.3d at 895. Turning to the federal claims, I first determined that the defendants had not violated the Religion Clauses by treating a religious school differently than they would have treated similarly situated nonreligious private schools. That was so, I determined, because the rule allowing benefits for only one private school per sponsoring group per attendance area applied to both religious and nonreligious schools. Further, the plaintiffs had not presented evidence from which a reasonable trier of fact could conclude that the defendants would have evaluated the plaintiffs' claim for benefits differently had St. Augustine been a nonreligious school. Here, I noted that the defendants might have decided that two unaffiliated Montessori schools were part of the same "sponsoring group," just as they determined that two unaffiliated Catholic schools were part of the same sponsoring group. *Id.* at 900–01.

I also addressed the plaintiffs' claim that the defendants' decisions resulted in "excessive entanglement" and therefore violated the Establishment Clause. Here, I noted that excessive entanglement, which is a concept that derives from *Lemon v. Kurtzman*, 403 U.S. 602 (1971), ordinarily applies to entire statutory schemes rather than to single

---

[2] The plaintiffs also alleged that the defendants' conduct violated the Equal Protection Clause, but they have since abandoned that claim. (ECF No. 60 at 14 n.9.)

decisions by government officials attempting to implement such schemes. Because the plaintiffs were challenging a single, potentially erroneous application of state law rather than the state law itself, I determined that excessive entanglement was not a viable legal theory. *St. Augustine*, 276 F. Supp. 3d at 901–02. In the alternative, I found that the defendants' decisions did not result in excessive entanglement because the defendants did not attempt to observe and classify St. Augustine's religious practices and beliefs. Instead, they accepted St. Augustine's own representation of itself on its website as a Roman Catholic school. *Id.* at 902–03.

The plaintiffs appealed the part of my summary-judgment decision that granted judgment to the defendants on the merits of the federal claims. In their appellate brief, the plaintiffs explicitly represented to the Seventh Circuit that they were not appealing my decision to relinquish supplemental jurisdiction over the state-law claims. (Pls. App. Br. at 14 n.5.) The defendants did not cross-appeal the judgment relinquishing supplemental jurisdiction or argue that my decision to do so involved an abuse of discretion.

In its first decision in this case, the Seventh Circuit, with one judge dissenting, affirmed the entry of judgment for the defendants on the merits of the federal claims. *St. Augustine*, 906 F.3d at 600. The court summarized its decision as follows:

> Contrary to the plaintiffs' assertions, the record does not establish that the Superintendent or the school district furnished or withheld public benefits on the basis of non-neutral religious criteria. Nor does the evidence support the claim that public officials impermissibly determined the school's affiliation on the basis of theology, ecclesiology, or ritual. Instead, it shows that public officials applied a secular statute that limits benefits to a single school affiliated with *any* sponsoring group—and, when St. Augustine declared itself to be Catholic, they took the school at its word.

906 F.3d at 593.

9

**D.    Additional Appellate Proceedings**

Following the Seventh Circuit's initial decision, the plaintiffs filed a petition for a writ of certiorari in the Supreme Court of the United States. After the Supreme Court decided *Espinoza v. Montana Department of Revenue*, 591 U. S. __, 140 S. Ct. 2246 (2020), it granted the plaintiffs' petition, vacated the Seventh Circuit's judgment, and remanded the case to the Seventh Circuit for further consideration in light of *Espinoza*. On remand, the Seventh Circuit asked the parties to file briefs that addressed the effect of the Supreme Court's decision in *Espinoza* and whether a then-undecided Supreme Court case, *Fulton v. City of Philadelphia, Penn.*, 593 U.S. __, 141 S.Ct. 1868 (2021), might affect the outcome of this case.

After the parties filed the requested briefs, the Seventh Circuit entered an order in which it stated that, although the case was originally about whether the defendants had violated the Religion Clauses, it had since "boiled down to one dispositive question of state law: what methodology for determining affiliation is required under the relevant Wisconsin statutes?" *St. Augustine School v. Taylor*, No. 17-2333, 2021 WL 2774246, at *2 (7th Cir. Feb. 16, 2021). The court expressed the view that, if the defendants had made an error of state law, then there would be "no need for [the court] to say anything further about the Religion Clauses of the U.S. Constitution." *Id.* However, by that time, no state-law claims were left in the case because I had relinquished supplemental jurisdiction over them and no party had appealed that part of my decision. In any event, because the Seventh Circuit deemed the state-law question dispositive, it decided, on its own initiative, to certify the question to the Wisconsin Supreme Court. The court defined the certified question in the following terms:

10

For purposes of determining whether two or more schools are "private schools affiliated with the same religious denomination" for purposes of Wis. Stat. § 121.51, must the state superintendent rely exclusively on neutral criteria such as ownership, control, and articles of incorporation, or may the superintendent also take into account the school's self-identification in sources such as its website or filings with the state.

*Id.* at *3. The Wisconsin Supreme Court accepted the certification and (with two justices dissenting) gave the following answer:

We conclude that, in determining whether schools are "affiliated with the same religious denomination" pursuant to Wis. Stat. § 121.51, the Superintendent is not limited to consideration of a school's corporate documents exclusively. In conducting a neutral and secular inquiry, the Superintendent may also consider the professions of the school with regard to the school's self-identification and affiliation, but the Superintendent may not conduct any investigation or surveillance with respect to the school's religious beliefs, practices, or teachings.

*St. Augustine Sch. v. Taylor*, 398 Wis. 2d 92, 637 (2021).

Back in the Seventh Circuit, the court interpreted the answer provided by the Wisconsin Supreme Court to mean that the superintendent was not limited to considering St. Augustine's corporate documents. *St. Augustine*, 21 F.4th at 448. However, the Seventh Circuit also understood that "as a matter of state law," the superintendent could not "delve into 'the school's religious beliefs, practices, or teachings,' because the latter inquiry would transgress the First Amendment prohibition against excessive entanglement with religious matters." *Id.* at 448–49 (quoting *Lemon*, 403 U.S. at 613). The Seventh Circuit then concluded that, in the present case, the superintendent's decision "was not justified by neutral and secular considerations, but instead necessarily and exclusively rested on a doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic church—because their religious beliefs, practices, or teachings were similar enough." *Id.* at 449. The court

11

reasoned that "[t]he fact that the Superintendent reached this result largely just by looking at St. Augustine's description of itself on its website does not matter—the doctrinal conclusion was an inescapable part of the decision." *Id.* Based on this reasoning, the Seventh Circuit held that the superintendent violated state law by denying benefits to St. Augustine. The court also determined that, in light of its state-law holding, it was not "necessary to reach any constitutional issues in this case." *Id.* at 451.

The Seventh Circuit then reversed my "grant of summary judgment in favor of the state defendants." *Id.* at 452–53. The court said nothing about that part of my decision or the resulting judgment that relinquished supplemental jurisdiction over the plaintiffs' state-law claims. But the court also wrote that "[b]ecause the case was dismissed before the district court had occasion to determine the amount of monetary damages (if any) to which the Forros or St. Augustine might be entitled, or what type of injunctive relief (if any) for any plaintiff is proper," the court would remand the case to me "for further proceedings consistent with this opinion." *Id.*

The plaintiffs filed a petition for panel rehearing with the Seventh Circuit. They pointed out that the only claim for relief before the court was their claim under 42 U.S.C. § 1983 for violation of the First Amendment. They also pointed out that, even if the defendants had violated state law by denying them benefits, they were still entitled to a decision on their constitutional claims because the existence of remedies under state law does not preclude a cause of action under § 1983. The plaintiffs told the Seventh Circuit that they believed that it was "unclear what cause of action [the Seventh Circuit] intends the district court [to] assess on remand for purposes of awarding relief." (Pet. for Reh'g at 1.) The plaintiffs also told the Seventh Circuit that they intended to pursue their federal

12

claims on remand and asked the Seventh Circuit to clarify whether I was permitted to consider them. (*Id.* at 7–8.) Without ordering a response from the defendants, the Seventh Circuit denied the petition for rehearing and provided no further clarification of its opinion.

## E.    Current Proceedings

When the case returned to this court, I asked the parties to file motions for summary judgment in which they addressed the effect of the Seventh Circuit's latest opinion and argued the merits of any potential state and federal claims. Those motions have been filed, and the superintendent (now Jill Underly) has renewed a motion to dismiss the claims against her that she had filed during earlier proceedings in the district court.

In their motion for summary judgment, the plaintiffs contend that I must decide the merits of their constitutional claims. The plaintiffs insist that their state-law claims were dismissed when I relinquished supplemental jurisdiction, and they do not contend that they are entitled to relief under state law in this action. Instead, they contend that the defendants violated the Free Exercise and Establishment Clauses of the First Amendment when they denied transportation benefits to St. Augustine and the Forros for each school year between 2015 and the present. The plaintiffs seek an injunction against both defendants to provide benefits and damages against the school district under § 1983 for each year in which the Forros were denied transportation aid.

The defendants, in turn, contend that the Seventh Circuit's latest decision precludes me from considering any federal claims. The school district contends that I am limited to declaring that St. Augustine and St. Gabriel are unaffiliated and determining whether the plaintiffs are entitled to injunctive relief or damages under state law. The

13

superintendent contends that I may not even consider whether the plaintiffs are entitled to relief under state law because the plaintiffs did not appeal my decision to relinquish supplemental jurisdiction over the state-law claim. The superintendent also contends that, even if I may award relief in connection with a claim, the plaintiffs' claim for an injunction is moot because the school district, in accordance with the Seventh Circuit's opinion, is now providing transportation to St. Augustine students. In her motion to dismiss, the superintendent also contends that she is not liable for damages, but this argument is unnecessary because the plaintiffs are not seeking damages from the superintendent in the first place. (Pls. Reply Br. at 30, ECF No. 72.) In the alternative, both defendants contend that the plaintiffs' federal claims fail on the merits.

## II. DISCUSSION

The first order of business is to determine what the Seventh Circuit wants me to decide on remand. Because the Seventh Circuit disposed of the appeal under state law, said in its opinion that there is no need "to reach any constitutional issues in this case," *St. Augustine*, 21 F.4th at 451, and remanded the case for me to consider whether the plaintiffs are entitled to injunctive relief or damages, the most natural interpretation of the opinion is that the court implicitly reinstated the plaintiffs' state-law claim and then remanded for a determination of whether the plaintiffs are entitled to relief under state law. Although the court did not expressly prohibit me from considering the merits of the plaintiffs' constitutional claims, such a prohibition seems to be implied in the court's own decision to refrain from deciding those claims. The court seems to have thought that a decision in the plaintiffs' favor under state law rendered a decision on the constitutional claims unnecessary. And if such a constitutional decision was unnecessary on appeal,

14

then it should also be unnecessary on remand to the district court. This is not a case in which I declined to consider the constitutional claims prior to the appeal and the Seventh Circuit remanded to me for a decision in the first instance. *See, e.g., Planned Parenthood of Ind. & Ky., Inc. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 606 (7th Cir. 2021) (taking no position on constitutional arguments that the district court did not address and remanding to the district court to consider them in the first instance). Instead, I decided those claims, and the Seventh Circuit held that, in light of its resolution of the state-law issue, it did not need to determine whether my decision was correct. All of this implies that the Seventh Circuit believes that its decision under state law has removed the constitutional claims from this case.

The plaintiffs contend that the Seventh Circuit's decision does not preclude me from considering the merits of their constitutional claims because the Seventh Circuit (1) overlooked the fact that the plaintiffs had abandoned their state-law claim and (2) erred in thinking that a decision under state law made consideration of the constitutional claims unnecessary. Regarding the first point, the plaintiffs note that I remanded the state-law claim to state court prior to the first appeal and that the plaintiffs did not challenge that decision on appeal or otherwise put the state-law claim before the Seventh Circuit. The plaintiffs expressly state that the state-law claim "is no longer at issue in this suit." (Pls. Br. at 14–15, ECF No. 60.) Regarding the second point, the plaintiffs cite several cases supporting the proposition that the existence of overlapping state remedies does not prevent a plaintiff from seeking relief under federal law via 42 U.S.C. § 1983. (*Id.* at 15 (citing, among other cases, *Monroe v. Pape*, 365 U.S. 167 (1961), and *Zinermon v. Burch*, 494 U.S. 113 (1990)).

15

Although I generally agree with the plaintiffs on these points, I do not believe that I am free to grant relief on the constitutional claims on remand. That is so because the plaintiffs' two points amount to an argument that the Seventh Circuit erred in holding that a decision on the constitutional claims was unnecessary. A district court may not, on remand, disregard the instructions of a higher court simply because it thinks that the higher court made a mistake. *See, e.g., Barrow v. Falck*, 11 F.3d 729, 731 (1993); *Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 609 (7th Cir. 1993). There is an exception to this rule that applies when "it is apparent that the higher court has committed a serious and demonstrable error . . . in circumstances where correction by filing a petition for rehearing in the higher court would not have been feasible." *Cole*, 8 F.3d at 609. But that exception cannot apply here because the plaintiffs filed a petition for rehearing on this very point that the Seventh Circuit denied. Thus, to carry out the Seventh Circuit's instructions, I must decide whether the plaintiffs are entitled to an injunction and damages under state law and also must abide by its express determination that a decision on the constitutional claims is unnecessary.

Nonetheless, because the plaintiffs will almost certainly file another appeal, I believe it makes sense to express my view on how the constitutional claims would turn out if I were free to reconsider them. Expressing my view on the outcome of the constitutional claims now avoids the possibility that the Seventh Circuit will determine that I erred in thinking that its mandate precluded me from considering the constitutional claims and then remanding the case to me for a third time to consider the merits in the first instance.

16

Below, I will first discuss whether the plaintiffs are entitled to relief under state law. I will then indicate how I would decide the constitutional claims if I were free to decide them.[3]

## A. Injunctive Relief and Damages Under State Law

As noted above, I understand the Seventh Circuit to have implicitly reinstated the plaintiffs' state-law claim and instructed me to determine whether the plaintiffs are entitled to injunctive relief or damages under state law. However, in their briefs on remand, the plaintiffs have refused to argue that they are entitled to relief under state law. Instead, they continue to insist that their state-law claim was remanded to state court and is no longer part of this case. (Pls. Br. at 14–15, ECF No. 60; Pls. Reply Br. at 6, ECF No. 72.) The plaintiffs rely exclusively on federal law when arguing that they are entitled to injunctive relief and damages (Pls. Br. at 28–31), and they point to no provision of state law that entitles them to either an injunction or damages.

In response to the Seventh Circuit's decision, the school district approved St. Augustine's attendance area and is now providing transportation to St. Augustine students. (*See* ECF No. 78-1.) St. Augustine has therefore received some benefit from the Seventh Circuit's decision under state law. However, because the plaintiffs have

---

[3] The defendants also raise issues concerning the relief to which the plaintiffs could obtain in connection with their federal claims. For example, they claim that the request for an injunction is moot because the school district has already approved St. Augustine's attendance area and is providing transportation to its students. However, I need not decide these issues. Even if the request for injunctive relief is moot, the plaintiffs continue to press a claim for damages against the school district, which means that there is still a live controversy against at least one defendant. The existence of that live controversy provides Article III jurisdiction to decide the merits of the plaintiffs' claims. And because the federal claims will ultimately fail on the merits, I need not resolve the parties' disputes over what remedies would be appropriate.

17

explicitly disavowed any claim for relief under state law, I conclude that they have waived any entitlement to damages or injunctive relief under state law. *See, e.g., Walsh v. Alight Solutions, LLC*, 44 F. 4th 716, 723 (7th Cir. 2022) (waiver is the intentional relinquishment or abandonment of a known right).

Although I do not have the benefit of briefing by the parties on this issue, I also note that damages and injunctive relief appear to be unavailable in an action for common law certiorari under Wisconsin law. *See Coleman v. Percy*, 96 Wis. 2d 578, 588–89 (1980). Because certiorari is the only state claim identified in the complaint (other than a request for declaratory relief), *see* Compl. ¶¶ 71–73, the plaintiffs would likely not be entitled to an injunction or damages under state law even if they did not abandon their claim for such relief.

Still, because the Seventh Circuit has already found that the defendants violated state law by refusing to approve St. Augustine's attendance area, I will enter a declaratory judgment that embodies this state-law ruling. However, I will award no other relief to the plaintiffs under state law.

## B. Merits of Constitutional Claims

In their constitutional claims, the plaintiffs contend that the decisions of the school district and the superintendent to deny transportation to St. Augustine students violated both the Free Exercise and Establishment Clauses of the First Amendment. The plaintiffs do not allege that any part of the Wisconsin framework for awarding transportation benefits to private schools is unconstitutional on its face. (Pls. Br. at 19, ECF No. 60.) Rather, the plaintiffs contend that the defendants' erroneous application of that framework

18

resulted in violations of the First Amendment that would not have occurred if the defendants had followed state law. (*Id.* at 20.)

### 1.    Free Exercise Clause

"The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, 'protects religious observers against unequal treatment' and against 'laws that impose special disabilities on the basis of religious status.'" *Espinoza*, 140 S. Ct. at 2254 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S.__, 137 S.Ct. 2012, 2021 (2017)). In cases decided since I last considered the plaintiffs' claims, the Supreme Court distilled its precedents "into the 'unremarkable' conclusion that disqualifying otherwise eligible recipients from a public benefit 'solely because of their religious character' imposes 'a penalty on the free exercise of religion that triggers the most exacting scrutiny.'" *Id.* at 2255 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021). Relying on these recent cases, the plaintiffs contend that the defendants' decision to deny them benefits violated the Free Exercise Clause because it penalized them for holding themselves out as Roman Catholic.

The plaintiffs rely primarily on the Supreme Court's decision in *Espinoza*, which was the basis for the Supreme Court's grant, vacate, and remand order in the present case. *Espinoza* involved a Montana scholarship program that provided tuition assistance to parents enrolling their children in private schools, including religious schools. *Id.* at 2251. After the Montana Supreme Court determined that the program violated a state constitutional provision that prohibited aid to a school controlled by a "church, sect, or denomination," several parents asked the Supreme Court to rule that this application of the Montana constitution violated the Free Exercise Clause. *Id.* at 2251–52. The Supreme

19

Court held that it did. The court noted that the scholarship program created a generally available public benefit, and that the application of the "no aid" provision barred religious schools from that benefit "solely because of the religious character of the schools." *Id.* at 2255. The Court stressed that, "[t]o be eligible for government aid under the Montana Constitution, a school must divorce itself from any religious control or affiliation." *Id.* at 2256. The Court said that "[p]lacing such a condition on benefits or privileges 'inevitably deters or discourages the exercise of First Amendment rights.'" *Id.* (quoting *Trinity Lutheran*, 137 S. Ct. at 2022). The Court noted that the "[t]he Free Exercise Clause protects against even 'indirect coercion,'" and that "a State 'punishe[s] the free exercise of religion' by disqualifying the religious from government aid as Montana did here." *Id.* The Court also noted that the application of the "no aid" provision burdened the parents' free-exercise rights because it disqualified them from otherwise available benefits "if they choose a religious private school rather than a secular one, and for no other reason." *Id.* at 2261.

In the present case, unlike in *Espinoza*, the state benefits program does not exclude religious schools. To the contrary, the Wisconsin busing law expressly allows religious schools to receive benefits. *See* Wis. Stat. § 121.51(1). St. Augustine and the Forros were denied benefits not because St. Augustine was a religious school, but because the benefits program limits benefits to one school per sponsoring group per attendance area, and the defendants determined that St. Augustine was affiliated with a sponsoring group that was already receiving transportation aid in the applicable attendance area. As the Seventh Circuit put it in its original decision, the plaintiffs were

denied benefits not because St. Augustine was a religious school, but because it was "second in line." *St. Augustine*, 906 F.3d at 597.

Of course, in its second opinion, the Seventh Circuit determined that the defendants made a mistake in applying state law when they concluded that St. Augustine and St. Gabriel were affiliated with the same sponsoring group. Still, the defendants did not deny the plaintiffs a benefit "*solely* because of their religious character." *Espinoza*, 140 S. Ct. at 2255 (emphasis added). Had St. Augustine applied for benefits before St. Gabriel, the defendants undoubtedly would have granted its request, even if St. Augustine professed to be Roman Catholic and even if the defendants processed its application under the same erroneous view of Wisconsin law. This, again, shows that it was the defendants' regarding St. Augustine as being second in line, rather than St. Augustine's religious character alone, that resulted in the denial of benefits.

The plaintiffs recognize that because the Wisconsin busing statute does not disqualify religious schools from receiving benefits, this case is different than *Espinoza*, but they contend that this difference is immaterial because the defendants required religious schools to "disclaim *particular* religious identities" to receive benefits. (Pls. Br. at 24 (emphasis in original).) But the defendants clearly did not deny the plaintiffs benefits based on a belief that no school that calls itself Roman Catholic was eligible for benefits, which is what they would have had to have done to impose a penalty on a particular religious identity. The defendants denied the plaintiffs benefits because another school that called itself Roman Catholic was already receiving benefits for the attendance area. This decision was based on the statutory rule that only one school affiliated with a single sponsoring group could receive benefits within a single attendance area.

Moreover, the defendants' misunderstanding of how to administer the "sponsoring group" rule did not impose a penalty on religious schools that would not have been imposed on nonreligious schools under the same circumstances. The Seventh Circuit held that, to comply with the Wisconsin Supreme Court's interpretation of the rule, which was designed to avoid excessive entanglement in religious affairs, the defendants should not have taken it upon themselves to decide that two schools that professed to be Roman Catholic were affiliated with the same sponsoring group. *St. Augustine*, 21 F.4th at 450–52. The defendants' failure to comply with this interpretation of the statue potentially implicated the Establishment Clause and the entanglement doctrine (which I discuss below), but it did not result in a free-exercise violation because the defendants did not apply a rule to religious schools that they would not have applied to nonreligious schools. As the Seventh Circuit noted in its first opinion, the defendants' interpretation of the statute "bars two self-identified Catholic schools from receiving transit subsidies, but it also bars funding two Montessori schools, two International Baccalaureate® schools, or two French International schools." *St. Augustine*, 906 F.3d at 597. Thus, the "penalty" created by the defendants' erroneous interpretation of the statute applied equally to religious and nonreligious schools. It cannot be regarded as a penalty on religious schools or particular religious identities.

In their reply brief, the plaintiffs sum up their free-exercise argument by contending that the defendants "put the Plaintiffs to a choice between exercising their religion and participating in society on equal terms with others." (Reply Br. at 16.) But, as explained above, that clearly is not what the defendants did. In this case, the "equal terms" included the rule allowing only one school per sponsoring group per attendance area. The

22

defendants may have made a mistake in thinking that St. Augustine was affiliated with a sponsoring group that was already receiving benefits for the transportation area, but they did not single out religious private schools in general, or specific religious beliefs and practices in particular, for unfavorable treatment. Thus, they did not put the plaintiffs to a choice between exercising their religion and receiving benefits under the same terms as any other school.

In short, because the rule as applied by the defendants did not cut St. Augustine off from benefits "for no other reason" than that it was a religious school, *Espinoza*, 140 S. Ct. at 2261, the defendants' denial of benefits did not violate the Free Exercise Clause.

### 2. Establishment Clause

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." The plaintiffs contend that the defendants' erroneous application of the Wisconsin busing law violated the Establishment Clause because it resulted in "excessive entanglement" between government officials and religious institutions. "Excessive entanglement" is one of the three prongs of the test announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Under the *Lemon* test, a court evaluating whether a government practice violates the Establishment Clause must consider: (1) whether the practice has a secular legislative purpose; (2) whether its principal or primary effect either advances or inhibits religion; and (3) whether the practice fosters an excessive government entanglement with religion. *Id.* at 612–13. The plaintiffs do not

contend that the defendants' decision violated the first two prongs. Rather, they focus on excessive entanglement only.[4]

In its most recent decision in this case, the Seventh Circuit determined that the defendants made an error of state law when they relied on St. Augustine's self-identification as a Roman Catholic school to conclude that St. Augustine and St. Gabriel were affiliated. The Seventh Circuit understood the Wisconsin Supreme Court to have interpreted the busing statute in a way that avoided entanglement concerns, and it found that the defendants violated this prophylactic interpretation by making a "doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic church—because their religious beliefs, practices, or teachings were similar enough." *St. Augustine*, 21 F.4th at 449.

The plaintiffs contend that the court's statement that the defendants made a "doctrinal determination" must be regarded as a finding of excessive entanglement that is now binding on me as law of the case. I disagree. First, the court expressly declined to decide any constitutional issue, and so it has made no express or implied ruling on excessive entanglement that could be regarded as law of the case. *See, e.g., Delgado v. U.S. Dep't of Justice*, 979 F.3d 550, 557 (7th Cir. 2020) (stating that the law-of-the-case doctrine applies to issues "expressly or impliedly decided by a higher court"). Second,

---

[4] In a recent case, the Supreme Court wrote that it "long ago abandoned *Lemon* and its endorsement test offshoot." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. __, 142 S. Ct. 2407, 2427 (2022). Thus, it is possible that the Supreme Court no longer regards excessive entanglement as an Establishment Clause violation. However, in *Kennedy*, the Court was primarily concerned with the "endorsement test offshoot" of the *Lemon* test, which is not implicated in this case. Thus, I will assume that the entanglement prong of the *Lemon* test remains good law.

even if the court's conclusion that the defendants made a doctrinal determination is binding on me, it would not follow that the defendants *excessively* entangled themselves in religious affairs. That is so because "[e]ntanglement is a question of kind and degree." *Lynch v. Donnelly*, 465 U.S. 668, 684 (1984); *Agostini v. Felton*, 521 U.S. 203, 233 (1997) (noting that "[n]ot all entanglements . . . have the effect of advancing or inhibiting religion" and stating that the Court "[has] always tolerated some level of involvement between" the state and religion). Thus, I must independently decide whether the defendants' act of entanglement amounted to excessive entanglement.

Turning to that question, I first note that we are here dealing with a single, erroneous application of state law, not a state law or ongoing policy that itself fosters entanglement with religion. The decision to deny the plaintiffs' benefits was made as part of a single administrative proceeding in which the decisionmakers attempted to apply the busing law to a unique circumstance in which a school that described itself as Roman Catholic claimed to be unaffiliated with another self-described Roman Catholic school. This fact weighs against a finding of excessive entanglement, for there was no overarching statutory scheme or policy that required repeated inquiry into religious affairs.

For two reasons, the plaintiffs dispute that this case involves only a single application of the busing statute. First, they contend that the defendants applied their own "*policy* for determining religious affiliation." (Pls. Reply Br. at 11 (emphasis in original).) The plaintiffs seem to be claiming that, if given the chance, the defendants would have repeatedly denied benefits to schools that self-identified as being associated with the same religious denomination as another school that already received benefits, even if the school disclaimed affiliation with the other school. But there is no evidence that, in this

25

case, the defendants were applying a preconceived policy rather than making an ad hoc determination based on a unique set of facts. In any event, the important point is that the defendants applied their erroneous methodology for determining affiliation only once, and so no excessive entanglement actually occurred. Second, the plaintiffs contend that the defendants' decision had the effect of denying the plaintiffs benefits for multiple school years. But even if that were true, it would not change the fact that there was only one administrative decision and therefore only one instance of the defendants' mistakenly entangling themselves in a matter of religious doctrine.

The plaintiffs also contend that even a single governmental action can result in excessive entanglement. They point out that, in *New York v. Cathedral Academy*, the Supreme Court stated that an excessive-entanglement problem "cannot be dismissed by saying it will happen only once." 434 U.S. 125, 133 (1977). But the plaintiffs take this statement out of context. The governmental action that the Court described as "happening only once" was an audit of claims for government benefits "by approximately 2,000 [religious] schools in amounts totaling over $11 million." *Id.* During the audit, the state would have "review[ed] in detail all expenditures for which reimbursement is claimed, including all teacher-prepared tests, in order to assure that state funds are not given for sectarian activities." *Id.* at 131–32. This audit would have involved thousands of individual determinations of whether classroom materials contained religious content. Obviously, such a massive inquiry is different in "kind and degree," *see Lynch*, 465 U.S. at 684, than a single administrative determination that two schools that call themselves Roman Catholic are, for that reason, affiliated with the same religious denomination.

26

Moreover, even if a single application of a law could rise to the level of excessive entanglement, here the defendants' involvement in religious affairs was not so great as to be excessive. The defendants did not perform any "comprehensive, discriminating, and continuing state surveillance" to determine whether St. Augustine and St. Gabriel were Roman Catholic. *Lemon*, 403 U.S. at 619. Instead, the defendants used St. Augustine's own statement on its website that it was Roman Catholic to determine that it was affiliated with Roman Catholicism, which is typically regarded as a single religious denomination by non-experts. Although the Seventh Circuit stated in its latest opinion that the defendants made a "doctrinal determination" that the "religious beliefs, practices, or teachings" of St. Augustine and St. Gabriel were "similar enough," *St. Augustine*, 21 F. 4th at 449, the court did not find that the defendants actually examined the religious beliefs and practices of each school to make this determination. Instead, the court found that the defendants' reliance on the "Catholic" label alone inherently involved a doctrinal determination, "even if only modestly." *Id.* at 452.

Finally, in a separate case, the Seventh Circuit recognized that an impermissible government involvement in a matter of religious doctrine will not necessarily rise to the level of excessive entanglement. In *Nelson v. Miller*, a Catholic prisoner claimed that the prison's chaplain violated the Establishment Clause by requiring him, but not adherents of other faiths, to provide written verification that his religious beliefs required him to consume a vegan diet. 570 F.3d 868, 880–81 (7th Cir. 2009), *abrogated on other grounds by Jones v. Carter*, 915 F.3d 1147, 1149–50 (7th Cir. 2019). The Seventh Circuit rejected this claim. As part of its analysis, the Seventh Circuit noted that the chaplain "improperly entangled him[self] in matters of religious interpretation" by sending the prisoner a letter

27

in which he cited Bible passages and argued with the prisoner over whether he was interpreting his faith correctly. *Id.* at 881. The chaplain's belief that the plaintiff's interpretation of his own religion was incorrect caused him to deny the plaintiff's request for a religious diet. *Id.* at 872. However, recognizing that entanglement is a question of "kind and degree," the court concluded that the chaplain's one-time act of entanglement did not rise to the level of excessive entanglement and therefore did not violate the Establishment Clause. *Id.*

The present case is like *Nelson*, in that the defendants' foray into a matter of religious doctrine, which resulted in a denial of a government accommodation, occurred only once. Moreover, the defendants' actions here were less invasive than was the chaplain's in *Nelson* because the defendants did not argue with the plaintiffs over the correctness of their religious beliefs or practices. Instead, the defendants thought that, by relying on St. Augustine's description of itself as Catholic and not examining its actual religious practices, they were *avoiding* entanglement in religious affairs. Accordingly, Seventh Circuit precedent supports the conclusion that the defendants did not excessively entangle themselves with religion.

In short, the defendants made an isolated determination that two schools that described themselves as Roman Catholic were affiliated with the same religious denomination. To make this determination, the defendants did not examine any school's or person's actual religious beliefs or practices or purport to define the tenets of Roman Catholicism. They simply took the schools' professions at face value and decided that, because the schools used identical words (Roman Catholic), they were affiliated. Their actions did not involve "intrusive government participation in, supervision of, or inquiry

28

into religious affairs." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 995 (7th Cir. 2006) (quoting *United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 631 (7th Cir.2000)). Accordingly, the defendants did not violate the Establishment Clause.

### 3.    Claim Based on the "Ministerial Exception"

Finally, the plaintiffs pursue a third legal theory that relies on Supreme Court cases defining the so-called "ministerial exception" to generally applicable employment laws.[5] Under this exception, which is based on the Religion Clauses, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. __, 140 S.Ct. 2049, 2060 (2020); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). The holdings of these cases have no application here because this case does not involve an attempt to enforce an employment law against St. Augustine. Nonetheless, the plaintiffs contend that some of the language used in the majority opinions in these cases shows that the defendants violated the Religion Clauses when they determined that St. Augustine was affiliated with St. Gabriel.

In the cases involving the ministerial exception, the Supreme Court stated that "the Religion Clauses protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe*, 140 S. Ct. at 2060 (quoting *Hosanna-Tabor*, 565 U.S. at 186). The Court then said that "[s]tate interference in that sphere would obviously violate the free exercise of religion, and any

---

[5] The defendants contend that the plaintiffs waived this argument by not presenting it in earlier proceedings. Because the argument fails on the merits, I will not discuss waiver.

29

attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Id.* The plaintiffs contend that the defendants violated these principles when they determined that St. Augustine was affiliated with St. Gabriel because they both used the label "Roman Catholic." However, the defendants did not interfere with St. Augustine's decision-making on matters of faith and doctrine or even attempt to influence those matters. Instead, they attempted to *identify* St. Augustine's religious denomination. Even if, in trying to identify St. Augustine's religious denomination, the defendants entangled themselves in religion, they certainly did not try to change or influence St. Augustine's actual religious beliefs, practices, or teachings.

The plaintiffs seem to suggest that the defendants attempted to influence their religious practices by denying them benefits on the ground that they called themselves Catholic. However, as I explained in the context of the plaintiffs' claim under the Free Exercise Clause, the defendants did not deny the plaintiffs benefits because they were Catholic but because they were second in line. Even under the defendants' erroneous interpretation of the busing law, the plaintiffs would have received benefits had St. Augustine been the first Roman Catholic school to request benefits in the attendance area. It is true that the busing law creates an incentive for a school to change its religious affiliation if a school of the same denomination already receives benefits within the attendance area—that's what the school in *Holy Trinity* did, *see* 82 Wis.2d at 146—but it does not follow from this that the state adopted the rule of one school per sponsoring group per attendance area for the purpose of encouraging schools to change their religious affiliations. Obviously, the purpose of the rule is to limit the local school district's

obligation to provide benefits to one school per sponsoring group, not to encourage private schools to break away from sponsoring groups to qualify for benefits.

The plaintiffs also point to language in *Our Lady of Guadalupe* that deemphasizes the role of religious titles in determining whether an employment position falls within the ministerial exception:

> If titles were all-important, courts would have to decide which titles count and which do not, and it is hard to see how that could be done without looking behind the titles to what the positions actually entail. Moreover, attaching too much significance to titles would risk privileging religious traditions with formal organizational structures over those that are less formal.

140 S. Ct. at 2064. The plaintiffs contend that this language means that the defendants violated the Religion Clauses when they determined that St. Augustine was affiliated with a different school because both schools used the label "Roman Catholic." But to make this argument, the plaintiffs take the quotation from *Our Lady of Guadalupe* out of context. The Court was not saying that the government violates the Religion Clauses every time it assigns significance to a religious title or label. To the contrary, the Court's prior case involving the ministerial exception held that the title of the employee was a factor that a court could consider when determining whether the exception applies. *See Hosanna-Tabor*, 565 U.S. at 191–92. In the passage that the plaintiffs quote, the Court was explaining that, because the lack of a religious title is not dispositive of whether an employee holds a position of religious significance within the church, factors other than the employee's title must also be considered to determine whether the ministerial exception applies. The Court was not implying that a single determination by the state, made for purposes of administering a government benefits program, that imputed significance to a religious label would violate the Religion Clauses.

31

Accordingly, I reject the plaintiffs' argument based on the ministerial exception.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiffs' motion for summary judgment (ECF No. 59) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that the court will enter the following declaratory judgment as a remedy for the defendants' violation of state law:

> The court declares that the Friess Lake School District (now part of the Holy Hill Area School District) and the Wisconsin Superintendent of Public Instruction violated Wis. Stat. § 121.51(1) by failing to approve the attendance area requested by St. Augustine School in 2015.

In all other respects, the motion is denied.

**IT IS FURTHER ORDERED** that the school district's motion for summary judgment (ECF No. 68) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted on all claims other than the claim for declaratory relief under state law.

**IT IS FURTHER ORDERED** that the superintendent's motion for summary judgment (ECF No. 65) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted on all claims other than the claim for declaratory relief under state law.

**IT IS FURTHER ORDERED** that the superintendent's motion to dismiss (ECF No. 65) is **DENIED**.

**FINALLY, IT IS ORDERED** that the Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 19th day of September, 2022.


/s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge

32